JOURNAL ENTRY and OPINION
{¶ 1} Appellant Andrew Mendez appeals a judgment of the Common Pleas Court finding him guilty of aggravated arson, assault, and three counts of negligent assault. Mendez assigns the following errors for our review:
 {¶ 2} "I. There was insufficient evidence to support appellant's conviction [sic] because the verdicts defy the law of physics."
 {¶ 3} "II. There was insufficient evidence to support appellant's conviction [sic]."
 {¶ 4} "III. The appellant's conviction [sic] is against the manifest weight of the evidence."
 {¶ 5} Having reviewed the record and pertinent law, we affirm Mendez's convictions. The apposite facts follow.
 {¶ 6} The Cuyahoga County Grand Jury indicted Mendez on four counts of aggravated arson, four counts of felonious assault, and three counts of obstructing justice. The charges resulted from an explosion at Jacobs Field during the ninth inning of an Indians baseball game. Mendez waived his right to a jury trial and a bench trial proceeded.
 {¶ 7} At the close of the bench trial, the trial court concluded the explosive device originated from the fifth floor at or about the picnic area, where greeter Patrick Vorreiter had observed Andrew Mendez. Vorreiter stated at trial "shortly before the explosion occurred, Mendez stood up near the railing, said that he was going to light a bomb and said to Vorreiter, "what are you going to do, white boy?" Vorreiter observed Mendez flicking a cigarette lighter before the explosion.
 {¶ 8} Several patrons suffered injury from the explosion. These individuals stood in an area near the stadium wall, which existed beneath the fifth floor picnic area, "the patio where Mr. Mendez admits he was located." The distance measured about 63 ft. from the railing where the picnic tables stood and the place where the explosion occurred.
 {¶ 9} The State introduced several witnesses to establish that Mendez detonated the device. Patrick Vorreiter described his station as the area at the top of the East 9th street entrance elevator, which is the area of the upper level picnic smoking area. He observed Mendez and another man in the area. Ultimately, the other man exited the area leaving only Mendez. Vorreiter noted Mendez yelling at females walking down a nearby ramp. Vorrieter focused on Mendez because of his behavior. Mendez was acting wild. Vorreiter watched this area and Mendez for about forty-five minutes before the explosion. He stated during this time Mendez drank two beers in quick succession.
 {¶ 10} After drinking the beers, Mendez sat at a picnic table near the railing flicking a cigarette lighter. Vorreiter stated at this moment Mendez uttered to him" what you going to do about it white boy?" Vorreiter did not respond. He did, however, notice a bulge in Mendez's pocket the size of an empty toilet paper roll.
 {¶ 11} Vorreiter saw Mendez leave the picnic table and approach the railing. Mendez then leaned over the railing and Vorreiter moved closer. Vorreiter became concerned and turned his head to look for help when he heard Mendez say, "look out for the bomb. Here it goes." Vorreiter, thereafter, smelled a firecracker wick burning. At the time he turned back, the explosion occurred. Vorreiter stated after the explosion, Mendez remarked what a good explosion; he acted jovial and laughed, while the rest of the crowd appeared confused and nervous. At that point, Vorreiter's supervisor, Brandon Kucinich came to the area, checked on Vorreiter, and told him to help the crowd below.
 {¶ 12} While on the next level, Vorreiter informed an officer about Mendez's behavior before the explosion. He accompanied the officer back to the picnic area; however, Mendez had exited the area. Five minutes later, he saw him walking down the ramp with two other males; at which time, another employee, Ryan Radefeld, also identified the males. Vorreiter later identified Mendez at the holding cell located at the stadium. He failed to identify Mendez at trial, which occurred ten months after the incident.
 {¶ 13} Another greeter, Ryan Radefeld, heard the explosion, and when he looked over the rail, he saw a woman hurt; his station was located near the picnic area. When he turned from looking over the rail he saw three males laughing and using profanity. He noticed them because the other patrons appeared confused. Radefeld's description of the men corresponded to Mendez, Clifton Oliver, and Donald Krieger's clothing on the night of the explosion. He heard one of the men say, "he dropped it, he dropped it." According to Radefeld, the men appeared intoxicated. He pointed the men out to a nearby officer, and Mendez, seeing him pointing, yelled at him, "don't point at me." When the officer called to the men to stop, they walked faster, as if trying to avoid the officer.
 {¶ 14} Brandon Kucinich testified he supervised the greeters. When the explosion occurred, he quickly approached the smoking area. He saw Mendez standing at the railing and asked him what had happened. Mendez responded, "I don't know but look at that lady down there — looks like she blew her freak'n legs off." According to Kucinich, Mendez did not appear worried but appeared to be "celebratory."
 {¶ 15} Donald Krieger testified he accompanied Mendez to the game. Before the game Mendez drank about two-to-three beers at the Olivers' house. They each drank an additional three-to-four beers in the car. Mendez drank an additional beer on the Rapid. Krieger testified he moved down to better seats and had not seen Mendez since the second inning. He later saw Mendez after the explosion occurred. He said at the time of the detonation he was outside the men's bathroom. He saw the explosion, but did not get hurt. He and Clifton Oliver then walked up to the upper level to locate their friends. They accessed the area from a closed escalator because Oliver had a spinal injury and did not want to be jostled by the crowd. As they got to the top of the escalator, they saw Mendez coming towards them. They asked Mendez what happened and he said he did not know, but that he had seen three African-American males throwing paper airplanes off the balcony before hand Mendez advised officers of this information. Thereafter, they searched for their other friends.
 {¶ 16} The officers, however, again stopped them and asked for their identification. According to Krieger, Mendez did not appear intoxicated and cooperated with the police. The officers released them, but the officers stopped them a third time and again asked for their identification and released them again. According to Krieger, at this time they felt upset and harassed. After they were released they decided to make a complaint of harassment to customer service in hopes of receiving free tickets or t-shirts. While at the customer service desk, the security again approached them and took them down to the stadium holding cell.
 {¶ 17} Several off-duty Cleveland police officers testified, who work as security at the games. Officer Smith testified a vendor stopped him and told him to check the three guys standing on the corner, later identified as Mendez, Oliver, and Krieger. When the officer questioned the men, Mendez told the officer he saw an African-American male wearing a blue shirt throw the explosive. The officer broadcasted that description over the radio. When he asked Mendez for his identification, Mendez became hot-headed and stated, "Why you f-ing harassing me." The officer could smell alcohol on Mendez. After obtaining Mendez's identification, he continued his search for the suspects as described by Mendez. Later, the same vendor stopped him and asked whether the three had been arrested. The vendor again told the officer that the three were involved. According to the officer, they never found three African-American males matching Mendez's description.
 {¶ 18} Officer Blasni testified during her investigation of the area she found what appeared to be a firecracker with small shards of paper. She spoke to an employee who said he observed a male throw something over the top of the railing and state, "there goes the bomb." While giving the description to officer Basni, the male saw the subject and identified him; he identified Mendez. The officer loudly said, "Excuse me sir, could you please come back here." Mendez and his friends continued walking; she then whistled loudly which caught their attention, but they kept walking. Mendez's friends eventually stopped, but the officer had to place her hands on Mendez to stop him. Mendez appeared intoxicated; he smelled of alcohol; his speech was slurred; his body movements appeared uneven; and his eyes were blood-shot. Mendez gave her a description of an African-American male with black shorts who Mendez stated threw things over the railing.
 {¶ 19} Greeter Brian Burke testified he observed something that looked like a small soup can drop to the ground and explode. A portion of his name tag was blown off and he suffered an abrasion the size of a quarter on his chest underneath his name tag. According to Burke, the device landed about a foot from the wall.
 {¶ 20} Forensic scientist, Richard Meyers, testified he examined the debris from the explosive device and found materials consistent with aerial shells, large firecrackers, and M-80s. He did not find any explosive residue on Mendez's shorts, but explained this was not unusual because he would not find explosive residue unless the device was leaking.
 {¶ 21} Several victims testified to temporary hearing loss due to the explosion. Judith Knight stated she was closest to the explosion and suffered severe burns to her legs; she temporarily lost sight in her eye.
 {¶ 22} The State rested and the defense counsel moved to dismiss all charges pursuant to Crim.R. 29. The trial court dismissed the obstruction of justice counts and three counts of aggravated arson.
 {¶ 23} In his defense, Mendez presented Shayla Oliver to testify. She testified that the group separated to find better seats and that once separated, she did not see the boys again. Although she admitted the group was drinking, she did not believe they were acting drunk. She denied speaking to an RTA employee while waiting for the train.
 {¶ 24} Mendez also testified and denied throwing the explosive device. He admitted to drinking several beers that night and that he was in the smoking area of the picnic section when the explosion occurred. At the time of the explosion, he claimed he was talking to a man wearing a bandanna when he saw a spark out of the corner of his eye. He maintained that after the explosion he continued talking to the man. About two-to-three minutes later, he saw his friends and approached them. He admitted he told Officer Johnson that prior to the explosion he saw three African-American teenagers throwing paper airplanes off the balcony. He denied telling police that he saw them throw an explosive device and claims he never accused them of anything but throwing paper airplanes. He could not explain why the security tapes did not show any evidence of paper airplanes being thrown, or why there is no depiction of three African-American males in the area.
 {¶ 25} He also contended, when the police were talking to him, the man wearing the bandanna came up to the police and told them Mendez had nothing to do with the explosion. He then testified to being stopped and released several times by police.
 {¶ 26} On rebuttal, the State presented the testimony of Tommy Hamilton, who testified he was an employee for RTA. While riding the Rapid home, he met two girls, one of whom was Shayla Oliver. He asked the girls why they left such a good game early and they told him the guys they were with got arrested for throwing a firecracker into a crowd of people. Others on the train asked the girls why the boys would do such a thing and the girls responded, "they were always doing something stupid."
 {¶ 27} Based on the above evidence, the trial court found Mendez guilty of one count of aggravated arson, one count of assault, and three counts of negligent assault. Mendez was sentenced to the minimum sentence of three years for the aggravated arson; six months for the assault, which was suspended; and sixty days on each negligent assault count, which were also suspended. He, therefore, received a total of three years.
 {¶ 28} In his first assigned error, Mendez argues the trial court erred in convicting him for detonating the explosion. Mendez argues the device took one second to fall sixteen feet. The security camera filmed the falling object; Mendez argues this is four times slower than an object dropped sixty-three feet. Consequently, he argues the object could not have been dropped from the picnic area. To reach this factual conclusion, Mendez asks this court to take judicial notice of a formula, which computes the rate of acceleration of falling objects. He also asks us to make the computation using the formula and judicially notice the rate of speed of the falling object.
 {¶ 29} "Courts may not shut their eyes nor close their ears to matters that are of general public knowledge and may take judicial notice of established facts."[1] It is the established fact that sets judicial notice apart from other judicial doctrines. What makes the fact established is that it is known in the common and general community.
 {¶ 30} Evid.R. 201(F) permits courts to take judicial notice at any stage of the proceedings, including the appeal. Evid.R. 201(B)(2) permits courts to take judicial notice of facts which are not subject to reasonable dispute in that they are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.
 {¶ 31} Here, Mendez provided a complicated formula, which requires explanation in order to apply. It contains terms that are not generally known such as "final velocity," "average velocity," and the "acceleration of gravity." As the court inBlankenship v. Nat. Lime[2] held:
 {¶ 32} "Judicial notice will not be taken of such scientific facts and matters, however, unless they are of such universal notoriety and so generally understood that they may be regarded as forming part of the common knowledge of every person. * * *"[3]
 {¶ 33} Furthermore, the application of the formula to the facts of the instant case requires an expert to consider the impact of the wind at Jacobs Field on velocity, the strength or impact of the release of the object, and the weight of the object's relationship to its speed. These factors would impact the object's movement, speed, and resting site. For these reasons, we decline to take judicial notice. Consequently, Mendez's first assigned error is overruled.
 {¶ 34} In his second assigned error, Mendez argues the trial court erred in convicting him on the contradictory testimony of Vorreiter. From what we can surmise from his argument, Mendez bemoans the manifest weight of the evidence, although he uses the reference "sufficiency." Sufficiency and weight of evidence are different as the Ohio Supreme Court pronounced in State v.Thompkins.[4] In Thompkins, the court held:
 {¶ 35} "[The] legal or sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different.
 {¶ 36} "With respect to sufficiency of the evidence, `sufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.' * * * In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. * * * In addition, a conviction based on legally insufficient evidence constitutes a denial of due process. * * *
 {¶ 37} "Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. * * * Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief. * * *'
 {¶ 38} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `"thirteenth juror"' and disagrees with the factfinder's resolution of the conflicting testimony. * * *"[5]
 {¶ 39} Mendez references sufficiency but bemoans the inconsistency of Vorreiter's testimony. Minor insignificant inconsistencies will not cause this court to reverse a judgment of the factfinder. For example, Mendez draws a distinction between Vorreiter's in-court reference" look out for the bomb. Here it goes," compared to his written statement, "look out for the bomb — there it goes" and, "it will be lit off." The difference in these statements are inconsequential as they both indicate that Mendez referenced a "bomb" mere seconds before the explosion.
 {¶ 40} Mendez also argues Vorreiter was inconsistent in testifying where Mendez was standing when he made the threat about the bomb. However, Mendez fails to realize, the importance of the evidence is not where Mendez was standing when he made the threat, but the fact the threat was made near the railing above the area where the bomb exploded.
 {¶ 41} Mendez also argues that Vorreiter's testimony was inconsistent because in his written statement he stated that Mendez asked, "What you going to do about it white boy?" immediately prior to the explosion, while at trial he testified the statement was made when Mendez was still seated at the picnic table. Again, we find such small differences inconsequential to the evidence that Vorreiter heard Mendez make the statement about the bomb seconds before the explosion.
 {¶ 42} Finally, Mendez argues the word "bomb" could have been a reference to attractive girls. However, this is mere speculation. No evidence existed in the record that Mendez said this in conjunction with his yelling at passing girls. Mendez's second assigned error is overruled.
 {¶ 43} In his third assigned error, Mendez sets forth additional reasons in support of his argument that his convictions were against the manifest weight of the evidence. He points to several statements made by the trial court, contained in its forty-seven page discussion of its verdict after the close of the evidence.
 {¶ 44} Mendez argues the trial court erred in finding Vorreiter's testimony was more credible than Mendez's. In doing so, Mendez again points to insignificant inconsistencies in Vorreiter's statements. He disputes the trial court's finding it unusual that the three men were not watching an exciting baseball game; that they were seated apart; and that they did not have a plan on how to reunite after the game concluded. He also disagrees with the trial court's finding Mendez intoxicated.
 {¶ 45} A review of the record below, however, clearly indicates that it was undisputed that Mendez was in the smoking area of the picnic area and had been drinking. Vorreiter testified that Mendez was acting wild, and before the explosion, he had seen a bulge in Mendez's pocket resembling an empty tube of toilet paper. Greeter Brian Burke observed the falling object and described it as a "small soup can." Also, prior to the explosion, Vorreiter heard Mendez say "look out for the bomb," and smelled the burning of a firecracker wick. After the explosion, Vorreiter stated that Mendez was laughing.
 {¶ 46} Other witnesses to the explosion corroborated that the explosive device resembled a small cylinder-like soup can. Brandon Kucinich also stated Mendez was acting" celebratory" after the explosion and Ryan Radefeld testified to seeing Mendez and his friends laughing after the explosion. Radefeld heard one of them say, "he dropped it, he dropped it." The sum total of this evidence construed together provides circumstantial evidence of Mendez's guilt.
 {¶ 47} We also agree with the trial court the fact that Mendez attempted to accuse three African-American teenagers of the act, could also be seen as his attempt to shift the inquiry away from himself. The officers testified that no one fitting Mendez's description of the suspects was found. Vorreiter testified there were no African-American males in the picnic area and the security camera also failed to show African-American males in the area or paper airplanes being thrown as Mendez claimed.
 {¶ 48} Mendez argues certain facts weigh in favor of his support of his innocence. However, these facts do not outweigh the finding of guilt. We acknowledge that Mendez and his friends did not immediately leave from the nearest exit. It is also true that no bomb residue was found in Mendez's shorts, but the expert concluded that this simply meant the explosive device was not leaking. Although Mendez and his friends attempted to file a complaint of officer harassment with customer service, that fact is not indicative of Mendez's innocence. We note from the record that the other two sought to file the complaint of harassment in an attempt to receive free tickets or a t-shirt.
 {¶ 49} Based on our review of the record, we conclude the trial court did not lose its way in its resolution of these issues of fact and credibility and in its finding Mendez guilty. Mendez's third assigned error is overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Sweeney, J., and Rocco, J., concur.
[1] Bozeman v. Fitz Maurice (1951), 62 Ohio Law Abs. 526.
[2] (Nov. 21, 1983), 3rd Dist. No. 3-83-1.
[3] Id., quoting 29 Am.Jur.2d Evidence § 104 (1967).
[4] (1997), 78 Ohio St.3d 380.
[5] Id. at 386-387.